575 F.2d 166
 UNITED STATES of America, Appellee,
v.
Richard J. ROTCHFORD, Appellant.
UNITED STATES of America, Appellee,
v.
Joseph Edward POWERS, Appellant.
UNITED STATES of America, Appellee,
v.
Ernest CARRANZA, Jr., Appellant.
UNITED STATES of America, Appellee,
v.
Glenn Alan RINKS, Appellant.
UNITED STATES of America, Appellee,
v.
David Grant FENNESSEY, Appellant.
UNITED STATES of America, Appellee,
v.
Leo Dominick RITI, Appellant.
 Nos. 77-1328, 77-1329, 77-1336 to 77-1339.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 12, 1977.
Decided April 19, 1978.
Rehearing Denied in Nos. 77-1328-1329 May 30, 1978.
 
 Daniel P. Reardon, Jr., St. Louis, Mo., argued and on brief, for Rotchford and Powers.
 James M. Martin, St. Louis, Mo., argued and on brief, for Carranza, Rinks, Fennessey and Riti.
 Barry A. Short (former U. S. Atty.) and Ronald E. Jenkins, Asst. U. S. Atty. (argued), St. Louis, Mo., on brief, for appellee.
 Before LAY, BRIGHT and HENLEY, Circuit Judges.
 HENLEY, Circuit Judge.
 
 
 1
 These appeals are from judgments in a criminal case entered by the United States District Court for the Eastern District of Missouri (The Honorable John F. Nangle, District Judge) in April, 1977. In March, 1977 Richard J. Rotchford, Joseph Edward Powers, Ernest Carranza, Jr., Glenn Alan Rinks, David Grant Fennessey, Leo Dominick Riti and Madonna C. Nostine were found guilty of having operated an illegal bookmaking business in the City of St. Louis and in St. Louis County between November 15, 1975 and January 3, 1976 in violation of 18 U.S.C. § 1955.[1]
 
 
 2
 The charge was based largely on the results of two telephone wiretaps authorized by the district court pursuant to the Omnibus Crime Control & Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq. (hereinafter at times called the Act), and evidence seized pursuant to search warrants issued out of the district court at the end of the interceptions.
 
 
 3
 The indictment charges that during the relevant period the defendants had conducted an illegal gambling business as defined in § 1955(b), and that the operation involved the taking and processing of wagers placed on horse races and football games. Motions to suppress evidence were overruled after extensive hearings and the defendants went to trial before a jury with Judge Nangle presiding. All seven of the defendants were found guilty. All of the defendants were fined and the male defendants received split sentences of imprisonment with six months to be served in a jail type institution. The male defendants, six in number, all filed timely notices of appeal, and the appeals have been consolidated and heard together. Ms. Nostine elected not to appeal.
 
 
 4
 The appellants, hereinafter defendants, contend for reversal that the district court erred in refusing to suppress evidence, that a variety of trial errors were committed, that a mistrial should have been declared on account of an allegedly impermissible and prejudicial closing argument made by government counsel, that errors were committed in connection with the instructions to the jury, and that, in any event, the evidence was insufficient to sustain the verdicts.
 
 
 5
 We have considered all of the contentions of the defendants,[2] and have found them to be without merit. Accordingly, we affirm the judgments of the district court.
 
 
 6
 There is no dispute about the background facts of the case or about its procedural history.
 
 
 7
 Although, as will be seen, the defendants deny that they were engaged in an illegal gambling business as defined in § 1955(b), they do not deny that at relevant times they have engaged in illegal gambling on horse races essentially the year-round and on football games during the late summer, fall and early winter months.
 
 
 8
 For a number of months prior to the commencement of the indictment period the activities of the defendants had been the subject of intensive investigation by agents of the Federal Bureau of Investigation, including Special Agent Douglas A. Dunnam, who was the "case agent" in charge of the investigation. The investigation involved surveillances of some of the subjects and of certain premises located in St. Louis and its suburbs to the north. And the investigation also involved the development of confidential information from two informers whom the Bureau considered to be reliable but who were unwilling to testify in court or before a federal grand jury.
 
 
 9
 On November 14, 1975 Richard A. Heidenry, Esq., a duly authorized Assistant United States Attorney, filed an application for authority to tap two telephones. One of those phones was located on premises described as 433 Hern Avenue and bearing the number 314 524 6750. That phone was listed in the name of John W. Fennessey; however, the address was actually the residence of Ms. Nostine. We will refer to that phone as 6750. The other phone was located at 8946 Annetta Street and was listed in the name of one Charles Lafser. The number of that phone was 314 867 9123, and we will refer to that phone as 9123.
 
 
 10
 The application recited that there was reasonable cause to believe that violations of §§ 1955 and 371 of 18 U.S.C. were being committed by the defendants Carranza, Powers, Rinks, Riti and Rotchford and others yet unknown. Powers, Rinks and Rotchford were identified as persons whose communications would probably be intercepted if the requested authority was granted, and the application also stated that there were others as yet unknown whose communications would be intercepted. It will be observed that the application made no reference to David Grant Fennessey or to Madonna C. Nostine.
 
 
 11
 The application was supported by a 31-page affidavit executed by Special Agent Dunnam which set out in great detail the facts of the investigation that the Bureau had been conducting, including descriptions of surveillances of persons and places and including information that had been supplied by the two confidential informers. The application was docketed as No. 75 Misc. 54 and was assigned to the docket of District (now Senior) Judge John K. Regan. Judge Regan considered the application ex parte and granted it. The maximum interception period allowed was twenty days from November 15, 1975, and it was stipulated that the authority to tap phone 9123 was limited to Saturdays and Sundays. The order provided that the interceptions should be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under the Act, and Mr. Heidenry was ordered to report to the court on the fifth, tenth and fifteenth days of the interceptions as to the progress that was being made toward achievement of the authorized objective and the need for continued interception.
 
 
 12
 The interceptions were executed and were fruitful. As would be expected, the intercepted communications were recorded on tape. It developed that bets on horse races only were accepted on 6750, and it is sometimes called the "horse phone." Bets on football games only were accepted on the 9123 number, and it is sometimes called the "football phone."[3]
 
 
 13
 On December 24, 1975 Mr. Heidenry presented a second application for interception authority, supported by a second affidavit of Special Agent Dunnam, to Chief District Judge James H. Meredith. This time the target phone was 314 834 2837 (2837) located in the home of the defendant Carranza at 9950 Cambria Drive. The application identified all of the defendants, including David Grant Fennessey and Madonna C. Nostine, as probable law breakers and as persons whose communications over the target phone would be intercepted. Judge Meredith granted the application, and his order permitted tapping of 2837 on Saturdays and Sundays only over a maximum period of twenty days. Communications over that phone were intercepted on December 27 and December 28, 1975. We observe at this point that due to the Christmas Holiday in 1975 the office of the clerk of the district court seems to have been closed from December 24, 1975 to December 29, 1975, and the papers that we have just mentioned were not filed with the clerk until December 29. That proceeding was docketed as 75 Misc. 62.
 
 
 14
 On January 2, 1976, a number of search warrants were issued out of the district court directed at various persons, premises and places. Those warrants were duly served, and a large quantity of evidentiary material was seized. It was later to be introduced in evidence over the objections of the defendants.[4]
 
 
 15
 An examination of the district court file in No. 75 Misc. 54 reveals that in early March, 1976 all of the defendants, including Fennessey and Nostine, were timely served with mandatory or discretionary inventories of interceptions as required by 18 U.S.C. § 2518(8)(d). And an examination of the district court file in No. 75 Misc. 62 reflects that all of the defendants were timely served with inventories relating to the interceptions of communications on 2837.
 
 
 16
 After the indictment was returned in December, 1976, the defendants moved to suppress the evidence that had been developed by the wiretaps and by the seizures under the search warrants. An evidentiary hearing on those motions was commenced before Judge Nangle on January 26, 1977. It was agreed that further hearings might be conducted before United States Magistrate William S. Bahn. Magistrate Bahn conducted hearings on January 27 and January 28. On February 28 he submitted a report to Judge Nangle making factual findings adverse to the defendants and recommending that the motions be denied. Judge Nangle accepted the report and denied the motions.
 
 
 17
 Jury trial began on March 7, 1977 and extended into March 11. The government's case consisted of the testimony of certain FBI agents and the playing of the tapes of the interceptions of the three phones that have been mentioned. There were also read to the jury certain stipulations of the parties. Able counsel for the defendants vigorously cross-examined the government's witnesses and pursued other defense tactics. However, the defendants elected not to take the stand; nor did they call any witnesses.
 
 
 18
 Although, as just indicated, the defendants made no effort to establish any particular defense theory by affirmative evidence, it is clear from the record that on the merits their position was that their gambling operations did not amount to a unitary gambling business involving five or more persons but were actually two and perhaps three separate operations with each involving less than five persons.[5]
 
 
 19
 While the tapes were being played before the jury, the jurors were permitted to have transcripts of the tapes in their possession. However, as soon as a tape was played, the transcript was taken up; the jurors were not permitted to take the transcripts with them to the jury room, and they were instructed that they might consider only what they had heard on the tapes and not what they had read in the transcripts.
 
 
 20
 The government's final witness was FBI Special Agent William L. Holmes who testified as an expert witness. Basing his testimony on what he had heard on the tapes and on his interpretations of the documentary evidence that had been seized by the government, he expressed the opinion that the operations of the defendants involved a single business compartmentalized between horse race betting and betting on "sporting events." He was of the opinion that the defendant Carranza was the head of the over-all operation, that Fennessey, Powers, Rinks and Riti occupied positions of managerial or ownership status in the business with Rotchford and Nostine playing minor roles.
 
 
 21
 At the conclusion of the government's case the defendants moved for the entry of judgments of acquittal. Those motions having been denied, the defendants rested with the government.
 
 
 22
 The instructions were then settled in chambers. Some requests for instructions by the defendants, including the "position instruction" already noted in the margin, were denied whereas others were granted. Some instructions requested by the government were given and some were refused, and the district judge gave some instructions of his own.
 
 
 23
 In the course of his final argument the Assistant United States Attorney who was trying the case for the government made some statements which defense counsel construed as a comment on the failure of the defendants to testify or call any witnesses, and defense counsel moved for a mistrial. The motion was denied.
 
 
 24
 What has been said to this point brings us down to the issues on this appeal which we define as follows:
 
 
 25
 1. Did the district court err in refusing to suppress the evidence obtained by the government by means of the wiretaps and search warrants that have been described?
 
 
 26
 2. Was error committed when the trial judge permitted the jurors to have in their possession transcripts of the tape recordings while the tapes were being played?
 
 
 27
 3. Did the district court err when it permitted Special Agent Holmes to testify that in his opinion the gambling operations of the defendants amounted to a single "gambling business"?
 
 
 28
 4. Was error committed when the district court declined to declare a mistrial on account of statements made by government counsel in his closing argument?
 
 
 29
 5. Did the trial court err in the area of jury instructions?
 
 
 30
 6. Was the evidence sufficient to sustain the verdicts?
 
 
 31
 Some of those issues are more serious than others, and we will take up the less serious ones first.
 
 
 32
 As to the claim that error was committed when the jurors were permitted to have transcripts of the tapes while the tapes were being played, we do not in general approve of the practice and sharply restricted it in United States v. McMillan, 508 F.2d 101, 105-06 (8th Cir. 1974), cert. denied, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975). However, from our consideration of the record and in view of the cautionary instructions given by the district court and the fact that the jury was not permitted to have the tapes during its deliberations, we cannot say that the limited use of the transcripts was error.
 
 
 33
 We think that it was a question that addressed itself to the discretion of the trial judge whether to permit Special Agent Holmes to express the view that the operations of the defendants constituted a single business rather than two or more. Of course, it was for the jury to say whether and to what extent it accepted the views of Agent Holmes, and the jury was so instructed. Such evidence is admissible in a § 1955 case in the discretion of the court. See Federal Rules of Evidence 702-704; United States v. Barletta, 565 F.2d 985, 992 (8th Cir. 1977); United States v. Bohn, 508 F.2d 1145, 1149-50 (8th Cir.), cert. denied, 421 U.S. 947, 95 S.Ct. 1676, 44 L.Ed.2d 100 (1975); Spinelli v. United States, 382 F.2d 871, 892 (8th Cir. 1967), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).
 
 
 34
 As to the alleged impropriety of the closing argument of government counsel, we have read the transcript of the argument and agree with the district judge that the challenged statements of counsel did not amount to an impermissible or prejudicial comment on the failure of the defendants to testify or to introduce evidence.
 
 
 35
 Turning now to the more serious questions in the case, we take up first the claim of the defendants that the trial judge erred when he refused to suppress the wiretap-search warrant evidence.
 
 
 36
 In considering the suppression question our task is made easier by the fact that counsel on both sides agree that if the authorization in No. 75 Misc. 54 was valid, then the authorization in No. 75 Misc. 62 and the search warrants were also valid, whereas if, on the other hand, the authorization in No. 54 was invalid, then the later authorization in No. 62 and the search warrants were invalid, and the government's whole case falls.
 
 
 37
 On this issue, the defendants contend, first, that the affidavit of Special Agent Dunnam was insufficient to show probable cause for the granting of the wiretap authority as required by 18 U.S.C. §§ 2518(1)(b) and 2518(3)(a)(b) and (d). The defendants argue that the affidavit was not sufficient to show probable cause to believe that the admitted gambling operations of the defendants amounted to the conducting of a single illegal gambling business rather than two or more businesses, and defendants rely heavily on the decision of the district court in United States v. Kleve, 337 F.Supp. 557 (D.Minn.1971). That decision, however, was reversed by this court in United States v. Kleve, 465 F.2d 187 (8th Cir. 1972).
 
 
 38
 No useful purpose would be served by undertaking to abstract or analyze the long affidavit in question. It was considered first by Judge Regan; it was considered again by Magistrate Bahn, who discussed it in detail, and finally it was considered again by Judge Nangle. We have appraised the affidavit in the light of such cases as Spinelli v. United States, supra, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); United States v. Kirk, 534 F.2d 1262 (8th Cir. 1976), cert. denied, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977); United States v. Kleve, supra, 465 F.2d 187 (8th Cir. 1972); and United States v. Smith, 462 F.2d 456 (8th Cir. 1972), and we are satisfied that the affidavit established the requisite probable cause. Certainly we cannot say that the successive findings of Judge Regan, Magistrate Bahn and Judge Nangle are clearly erroneous.
 
 
 39
 The defendants also contend that the minimizing requirements of the Act which appear as 18 U.S.C. §§ 2518(1)(c) and 2518(3)(c) were not met. We find no merit in that contention which was discussed specifically by Magistrate Bahn.
 
 
 40
 It is argued that it was not satisfactorily shown that investigative techniques more conventional than wiretapping had been tried and had failed or would not have been likely to succeed. See 18 U.S.C. §§ 2518(1)(c) and 2518(3) (c).
 
 
 41
 The Dunnam affidavit recites that normal investigative procedures "appear unlikely to succeed for the reason that conduct of these gambling operations and related activities are carried on in a clandestine and secretive fashion, and the individuals named have taken certain precautions to insure that their activities remain secretive and that their customers remain anonymous." The affidavit then went on to describe in great detail the nature of the over-all investigation and what had been revealed.
 
 
 42
 As in the case of the question of probable cause, likewise the question of whether wiretap authority was really necessary was considered initially by Judge Regan on the basis of the Dunnam affidavit, and he found that "normal investigative procedures either have been tried without success and reasonably appear unlikely to succeed if continued, or reasonably appear unlikely to succeed if tried."
 
 
 43
 In connection with the motions to suppress, the Magistrate found that the evidence established that certain normal procedures had been followed without success, that there were good reasons why others had not been followed, and that need for wiretap interceptions had been established. Judge Nangle adopted that finding. We agree with the district court. See Judge Van Oosterhout's discussion of the problem in United States v. Matya, 541 F.2d 741, 744-46 (8th Cir. 1976), cert. denied, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977).
 
 
 44
 David Grant Fennessey complains individually that as to him there was no compliance with the "naming requirement" appearing in 18 U.S.C. §§ 2518(1)(b) (iv) and 2518(4)(a). If prior to the application for the first wiretap authority the government knew or had probable cause to believe that communications of Fennessey would be intercepted on either on the target telephones, then it was the duty of the government to identify him in the application and to see to it that he was identified in the authorizing order. See United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).
 
 
 45
 While this particular contention may have been included in Fennessey's motion to suppress, it was not urged before the Magistrate, and the Magistrate made no specific finding with respect to it. Special Agent Dunnam testified categorically that he had no knowledge that Fennessey would be using either of the target phones mentioned in the original application.
 
 
 46
 In any event, it is clear that Fennessey was served with an inventory of the interceptions of his conversations under the first order, and, as has been seen, he was identified in the second application and order. There is nothing here to suggest that the failure of the government to name Fennessey in the first application and order was improperly motivated or that Fennessey was prejudiced in any way by the failure to identify him initially. So, his contention is rejected. United States v. Donovan, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); United States v. Barletta, supra; see also United States v. DiGirlomo, 550 F.2d 404 (8th Cir. 1977).
 
 
 47
 We have given careful consideration to the instructions that the district court gave to the jury, and when they are viewed as a whole, we think that they fairly and correctly stated the law, and that the district court did not err in refusing certain requests tendered by the defendants or in granting certain requests put forward by the government. There are certain specific comments that we would make.
 
 
 48
 Section 1955(b)(1)(iii) stipulates that in order to fall within the prohibition of the statute a gambling business must have been in substantially continuous operation for more than thirty days or must have had a "gross revenue" of at least $2,000.00 in any single day. It will be observed that the requirements are stated in the disjunctive.
 
 
 49
 In its Instruction No. 9 the district court told the jury that "gross revenue" of a gambling operation is measured by the total amount of wagers placed during a day, as distinguished from the net profits of the operation during that day. That appears to have been a correct statement of the law. United States v. Ceraso, 467 F.2d 653, 656-57 (3d Cir. 1972), cited with approval in United States v. Smaldone, 485 F.2d 1333, 1351 (10 Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 and 416 U.S. 951, 94 S.Ct. 1960, 40 L.Ed.2d 301 (1974); United States v. Schullo, 363 F.Supp. 246, 248-49 (D.Minn.1973). Moreover, regardless of any question of gross revenue, there is no doubt whatever that the operations of the defendants had been substantially continuous for more than thirty days.
 
 
 50
 In its next two instructions the district court dealt with the statutory requirement that the business involve five or more persons. In Instruction No. 10 the jury was told that to "conduct" a gambling business means to perform any act, function or duty which is necessary to or helpful in the ordinary operation of the business, and that a person may be found to conduct a gambling business even though he is a mere servant or employee having no part in the management or control of the business and no share in the profits, but that a mere bettor or customer of a gambling business cannot be said to conduct the business. And in Instruction No. 11 the jury was told that the statute "includes all of those who participate in the operation of a gambling business, regardless of how minor their roles and whether or not they are labeled, agents, collectors, telephone clerks, or the like" and excludes "only customers of the business." Those instructions amounted to a correct declaration of the law. United States v. McCoy, 539 F.2d 1050, 1059-60 (5th Cir. 1976), cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977); United States v. Brick, 502 F.2d 219, 225, n.17 (8th Cir. 1974); United States v. Meese, 479 F.2d 41, 43 (8th Cir. 1973).
 
 
 51
 Defendants complain because the district court did not give their requested Instruction "D" which was their "position" or "theory of defense" instruction. The instruction would first have told the jury that the burden was on the government to prove all of the essential elements of the offense charged by evidence beyond a reasonable doubt. That part of the instruction was fully covered in the instructions that were given. The request then proceeded as follows:It is defendants, Carranza and Fennessey's position that:
 
 
 52
 1. Their business took football bets and did not take bets on horses and operated only during the football season.
 
 
 53
 2. That Defendant Riti was used solely as a collector and did not take or accept bets.
 
 
 54
 3. That Defendant Rinks was an independent contractor booking some football business on his own that he brokered to others and some horse betting business that he brokered to others.
 
 
 55
 4. That Defendants Fennessey and Carranza did not share any profits, losses or business with Powers, Rotchford or Nothstine.
 
 
 56
 That part of the instruction was refused by the district court.
 
 
 57
 In the course of its instructions the district court read the indictment in its entirety and also read § 1955(a) and pertinent parts of § 1955(b). In Instruction No. 8 the jury was told that the burden was on the government to establish each of the essential elements of the offense charged and then defined those elements as including the requirement that ". . . five or more persons, including the particular defendant, knowingly and intentionally conducted, financed, managed, supervised, directed or owned all or a part of such gambling business. . . ." And Instruction No. 16 was as follows:
 
 
 58
 Each defendant in this case is individually entitled to, and must receive, your determination whether he was a member of the alleged group of five (5) or more engaged in an illegal gambling business. As to each defendant you must determine whether he was a member by deciding whether he willfully, unlawfully and knowingly joined with any of the other defendants in an illegal gambling business.
 
 
 59
 While we think that the district court might well have given a theory of defense instruction as such, we do not find any error in the refusal to give the particular instruction requested which in its final portion was misleading. Viewing the instructions as a unit and taking into consideration the line of cross-examination of government witnesses taken by defense counsel, and the closing arguments, the jury was adequately advised as to the issues and as to the fact that the defendants were denying that their operations constituted a single "business" involving five or more persons. In the circumstances we do not think that the defendants suffered any prejudice by the fact that the jury was not given an instruction commencing with a phrase such as "the defendants contend. . . ."
 
 
 60
 Finally, we consider the question of the sufficiency of the evidence to sustain the convictions. We are required, of course, to view the evidence in the light most favorable to the government and to give the government the benefit of all inferences favorable to it that reasonably may be drawn from the evidence.
 
 
 61
 When that approach is taken, we are satisfied that the jury was justified in finding, although not required to find, on the basis of the stipulations of the parties, the testimony of the agents, including the expert testimony of Agent Holmes, the contents of the tapes and the documentary evidence that had been seized, that the defendants were engaged in the operation of an illegal gambling business as defined in § 1955(b) and prohibited by § 1955(a).
 
 
 62
 Affirmed.
 
 
 
 [1]
 In pertinent part § 1955 is as follows:
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 (b) As used in this section
 (1) "illegal gambling business" means a gambling business which
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
 (3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.
 Bookmaking gambling is illegal under Missouri law. M.R.S. §§ 563.350 and 563.360.
 
 
 [2]
 Defendants Rotchford and Powers are represented by one attorney. The other four defendants are represented by another attorney who has advanced a number of arguments common to all six defendants; some of those arguments were not included in the brief filed on behalf of Rotchford and Powers. However, we will consider that the contentions of all of the defendants are coextensive
 
 
 [3]
 We note that an expert witness called by the government referred to betting on "sporting events" and horse races and did not limit to football games his reference to "sporting events." However, during the period with which we are concerned football, college and professional, was about the only sport other than horse racing that would have been likely to attract substantial gambling interest in the St. Louis area
 
 
 [4]
 The material makes up Government Exhibits 4-15 and consists of documentary material, much of which is incomprehensible to one lacking familiarity with bookmaking terminology and procedures
 
 
 [5]
 That theory was set out in Requested Instruction "D" submitted by counsel for Carranza, Fennessey, Rinks and Riti. The request was denied by the trial judge; we shall have occasion to comment upon it later