**UNITED STATES of America, Appellee,**

v.

**Bienvenido ULERIO and Raphael Abreu, Defendants–Appellants.**

Nos. 1423, 1424, Dockets 88–1132, 88–1159.

United States Court of Appeals, Second Circuit.

Argued Aug. 15, 1988.

Decided Oct. 24, 1988.

Henriette D. Hoffman, The Legal Aid Soc., Federal Defender Services Unit, New York City, for defendant-appellant Raphael Abreu.

Michael H. Sporn, New York City, for defendant-appellant Bienvenido Ulerio.

Douglas T. Burns, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Matthew E. Fishbein, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before WINTER and MINER, Circuit Judges, and BILLINGS, District Judge.*

WINTER, Circuit Judge:

Bienvenido Ulerio and Raphael Abreu appeal from judgments of the United States District Court for the Eastern District of New York convicting each, after a jury trial, of conspiracy to sell, and of selling, counterfeit United States currency in violation of 18 U.S.C. §§ 371 and 472 (1982). Ulerio and Abreu claim that Judge Nickerson erred by submitting to the jury transcripts of recorded conversations because the transcripts included voice attributions identifying the defendants. In addition, Ulerio contends that the questioning of him by the court conveyed to the jury the impression of disbelief. We affirm.

## BACKGROUND

The government's evidence showed the following. On July 28, 1987, a confidential informant introduced Secret Service undercover agent Luis Quinones to defendant

---

* The Honorable Franklin S. Billings, Jr., United States District Judge for the District of Vermont, sitting by designation.

Raphael Abreu and a second individual named "Gordo". The four men discussed the possibility of Abreu and Gordo selling counterfeit money to Quinones. At the conclusion of the meeting, Abreu took Quinones's telephone and beeper numbers with the understanding that Abreu would subsequently contact Quinones concerning such a sale.

On August 4, Quinones received a call from Abreu. During the ensuing conversation, which was in Spanish, Abreu agreed to sell Quinones $2,000 in counterfeit currency at 3:00 p.m. at a McDonald's Restaurant located on Atlantic Avenue in Brooklyn. This conversation was subsequently translated and transcribed in English.

Quinones, equipped with a recording device, met with Abreu and the confidential informant in Quinones's car at the appointed time and place. Abreu objected to the McDonald's location as being too public and suggested relocating to a position down the street. As Quinones neared that location, a man exited Abreu's car and entered Quinones's car. Quinones identified this man as defendant Bienvenido Ulerio. Once inside Quinones's car, Ulerio produced twenty counterfeit $100 Federal Reserve Notes which he exchanged with Quinones for five genuine $100 bills and two genuine $50 bills that had earlier been photocopied by government agents. After completing the transaction, Ulerio left Quinones's car but returned a few minutes later with Abreu. Abreu and Quinones then discussed a future deal in which Abreu would supply Quinones with an additional $50,000 of counterfeit money. Abreu also provided Quinones with a sample counterfeit $50 bill for Quinones to show to Quinones's supposed boss. These conversations were also in Spanish and later translated and transcribed in English.

Ulerio and Abreu contacted Quinones by telephone twice later that same day. Agent Quinones told the defendants that his boss liked the defendants' counterfeit money and wanted to proceed with the deal for the additional $50,000. A meeting was scheduled for August 7, 1987. This conversation was also in Spanish and later trans-

lated and transcribed in English. The August 7 exchange did not take place, however, and on August 10 both defendants were arrested. When arrested, Abreu was carrying $300 of the previously photocopied money in his wallet.

At trial, Judge Nickerson admitted the translated transcripts of the various recorded conversations. These transcripts contained notations identifying the defendants as parties to the various conversations with Quinones. Both defendants testified. They stated that they were the victims of mistaken identity and denied any contact with Quinones.

## DISCUSSION

■ The defendants concede the accuracy of the content of the translated text of the transcripts admitted at trial. It was therefore not an abuse of discretion to admit the transcripts into evidence and to allow the jury to retain the transcripts during their deliberations. *See United States v. Marin*, 513 F.2d 974, 977 (2d Cir.1975) (allowing Spanish-to-English transcript translations into jury room not error); *United States v. Koska*, 443 F.2d 1167, 1169 (2d Cir.) (per curiam) (allowing jurors to use transcripts not error), *cert. denied*, 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971). The only question before us concerns the notations on the transcripts purporting to identify the speakers.

■ Both defendants testified that Quinones misidentified them as the persons involved in the unlawful transactions. Central to this claim was their assertion that the voices on the recordings were not their own. They contend it was error to admit the transcripts with voice attributions without a limiting instruction cautioning the jurors that the admission of the transcripts did not reflect agreement as to the identities of the speakers and that the accuracy of voice identifications on the transcripts was an issue for determination by the jury. *See United States v. Rosenthal*, 793 F.2d 1214, 1238 (11th Cir.1986) (whether transcript correctly identifies speakers question for jury determination),

cert. denied, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987).

We disagree. Although such an instruction would surely have been permissible, it was within the district court's discretion to regard it as superfluous. The jury was well aware that appellants denied having any conversations or relationship with Quinones. It also knew that the notations on the transcripts purporting to identify the speakers were based on—and had no evidentiary value greater than—Quinones's testimony. The interpreter who prepared the transcripts testified that the voice attributions on the transcripts came from Agent Quinones. The issue as to whether these voice identifications were accurate was thus identical to the issue of the credibility of Agent Quinones's identification of defendants. Judge Nickerson's charge to the jury addressed this latter issue in detail, stating, in pertinent part:

> In this case, the Government has offered the testimony of Agent Quinones as proof that the defendants transferred counterfeit currency. Therefore, the identification by Agent Quinones of the defendants as those persons who transferred the counterfeit money is a critical part of the Government's case. In evaluating the agent's testimony regarding the defendants' identities you must, as with any witness, consider whether he is telling the truth as he understands it. You must also determine whether he might be honestly mistaken about the identity of the defendants.
>
> The identification testimony is an expression of belief on the part of the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and, later, to make a reliable identification of the offender. In judging the value of Agent Quinones' identification testimony, you should consider the following matters: Did the agent meet with the defendants before the incident in question? And if so, how many times? At the time of the incident in question, did the agent have the ability to see the defendants? How much time passed between the incident and the subsequent identification?
>
> Under what circumstances was the identification made?
>
> You should scrutenize [sic] the identification testimony with great care. Only if you are convinced beyond a reasonable doubt that the identification of the defendants was accurate may you rely on this testimony as evidence of [the defendants'] guilt.

The jury clearly took this instruction to heart and understood the relationship between Quinones's identification testimony and the voice attributions on the transcripts. Although neither the prosecution nor the defense chose to play the actual recordings at trial, the jury specifically requested to hear them. This request amply demonstrates that the jury knew that the identification issue included the accuracy of the voice attributions and decided to compare for itself the voices on the tapes with those of the defendants, whom they had heard testify in Spanish.

This was not a case in which a claim is made that a specifically identified individual other than the defendant is the speaker in a recorded conversation or one in which the defendants dispute among themselves who was a party to such a conversation. In such circumstances, the defendants can offer transcripts with identifying notations that correspond to their evidence. Indeed, in the instant case, the district court offered to admit alternative transcripts but the offer was spurned because defendants denied participation in any of the conversations. There was, therefore, no error.

We also reject Ulerio's claim that Judge Nickerson's inquiries conveyed the impression that he questioned Ulerio's credibility. We have examined the record and conclude that Judge Nickerson's questions merely clarified ambiguities in Ulerio's testimony and were therefore proper.

AFFIRMED.