**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael B. MITCHELL;  Clarence M.
Mitchell, III, Defendants–Appellants.**

No. 88–5529.

United States Court of Appeals,
Fourth Circuit.

Argued April 14, 1989.

Decided June 8, 1989.

Rehearing and Rehearing In Banc
Denied Aug. 28, 1989.

William Moses Kunstler, New York City, John J. McDermott (O'Connor & Hannan; Sean Connelly, Brand & Lowell, Washington, D.C., Michael Milleman, on brief), for defendants-appellants.

Gary Patrick Jordan, First Asst. U.S. Atty., Bel Air, Md. (Breckinridge L. Willcox, U.S. Atty., Washington D.C., Max H. Lauten, Asst. U.S. Atty., Baltimore, Md., on brief), for plaintiff-appellee.

Before HALL, SPROUSE, and CHAPMAN, Circuit Judges.

K.K. HALL, Circuit Judge:

Michael B. Mitchell and Clarence B. Mitchell, III ("appellants" or "the Mitchells") appeal their convictions of corruptly endeavoring to obstruct a congressional investigation, 18 U.S.C. § 1505, and of wire fraud, 18 U.S.C. § 1343. Michael Mitchell also appeals his conviction on a separate count of wire fraud. Finding no error as to any of the convictions, we affirm.

I.

This is another of the many prosecutions related to Wedtech Corporation, a manufacturing firm located in the South Bronx, New York. Wedtech was a rather small manufacturing firm until, in 1979, it became certified as a minority small business under the Small Business Administration's ("SBA") 8(a) program. Under the 8(a) program, government agencies set aside certain contracts to be awarded to minority-owned businesses on a noncompetitive basis. Wedtech qualified for this program because its principal shareholder and president, John Mariotta, is Hispanic.

Once qualified under the program, Wedtech became extremely successful, so much so that its stock was publicly traded on the New York Stock Exchange. This tremendous success led to serious questions and numerous complaints concerning Wedtech's continuing eligibility for a program intended to help small minority businesses.

These complaints eventually reached Parren J. Mitchell, the representative from Maryland's Seventh Congressional District. Congressman Mitchell chaired the House Committee on Small Business, the committee with oversight authority of the SBA's minority business program. In response to the growing controversy surrounding Wedtech, Mitchell instigated an investigation into the situation. On July 27, 1984, the chief investigator for the Small Business Committee hand-delivered a letter from the Committee to the SBA regional offices in New York City requesting that all of the files on Wedtech be turned over to the Committee.

News of this investigation quickly reached Wedtech and touched off a flurry of activity to stop it. Because nearly all of Wedtech's business was derived from the SBA program, any loss of eligibility would have been highly detrimental. The corporation's officers moved quickly to lobby Congressman Mitchell, enlisting several friendly congressmen in the effort. None of these efforts proved fruitful, however, and the investigation continued.

Richard Strum, an assistant vice-president at Wedtech, was one of the company's officials involved in the effort to stop the investigation. Strum called Anthony Loscalzo, one of Wedtech's marketing consultants. Loscalzo, who was located in Illinois, had previously lived and worked in the Baltimore area and had kept close ties with the Mitchells, who are brothers and members of a prominent black political family in the area. Loscalzo advised Strum that the Mitchells might be able to help Wedtech with the investigation because of their close relationship with their uncle, Congressman Mitchell.

Strum flew to Baltimore on September 24, 1984, and arranged to meet with Michael Mitchell the next evening. At the meeting, Strum told Michael that he had been referred to him by Loscalzo and that Wedtech needed the committee's investigation stopped. Michael responded that for a substantial fee he could "get rid of the problem." Strum did not close the deal and told Michael that he first had to contact his superiors at Wedtech. The meeting ended with the understanding that Strum would get back to the Mitchell brothers if Wedtech were interested.

After the meeting, Strum called Loscalzo. Loscalzo informed Strum that he and Michael had a longtime fee-splitting arrangement whereby Loscalzo received one-third of all fees from referral clients. Strum and Loscalzo agreed that they would split this referral fee 50–50.

When Strum returned to New York on September 26, he returned to an organization that was growing increasingly anxious. Through contacts in the New York City SBA office, Wedtech officials had learned that on September 24, Congressman Mitchell had sent a confidential letter to SBA stating that the Committee's review of Wedtech had led to substantive questions concerning the company's continued participation in the minority set-aside program. The letter further stated that the Committee wanted SBA to thoroughly investigate the situation and listed several specific inquiries to be made.[1]

When Strum was told of the letter, he immediately made several telephone calls to Maryland to set up a meeting with the Mitchells. Eventually, a meeting was arranged for October 1 at the law offices of Michael Mitchell.

At the October 1 meeting, Wedtech was represented by Strum, Loscalzo, executive vice-president Mario Moreno, and its president, Mariotta. After explaining the Wedtech operation to the Mitchells, Moreno

1. The government produced no evidence that at this point, the Small Business Committee had formally voted to authorize the investigation.

complained that the investigation initiated by their uncle was creating a serious problem. He indicated that if the Mitchells could solve this problem, Wedtech would be in a position to do a lot of business with them.

Michael Mitchell responded that he was familiar with the investigation and that he and his brother could stop it for a fee of $50,000. He cautioned the group that the investigation was moving quickly and that the fee should be paid as soon as possible because the brothers would take no action until it was received. Michael then drafted a "retainer letter" which stated that the $50,000 fee was to retain his law firm for future legal services. Strum and Moreno both testified that the letter was a cover-up for the real purpose of the fee.[2]

The next day, a $50,000 check was hand-delivered from Wedtech to Michael's law offices. Bank records show that the check was cashed immediately and that from it Loscalzo received $16,666.66, which he divided equally with Strum. Other than Strum and Loscalzo, no one at Wedtech was aware of this "fee-splitting" arrangement.

There is no evidence in the record that the Mitchells took any further action to influence the investigation. In fact, there is no evidence that either Michael Mitchell or any other member of his law firm performed any legal services on behalf of Wedtech after he received the fee. Nonetheless, once the fee was paid, Wedtech's officials perceived that the investigation had been thwarted.

Because Wedtech's officials were pleased with the Mitchells' ability to persuade their uncle, in February, 1985, another $50,000 was paid to them to influence the Committee to begin an investigation of one of the company's competitors. As before, there is no evidence that either brother did anything further to influence the Committee and the fee was split with Loscalzo and Strum.

In May, 1987, after an extensive federal investigation of Wedtech, the Mitchells were named in a five-count indictment. All of the counts arise from the initial $50,000 payment. The first two counts charged the brothers with endeavoring to obstruct a congressional investigation and a corresponding conspiracy charge. The third and fourth counts were for wire fraud and were based on Strum's use of the wires in arranging the October 1, 1984, meeting. The government alleged that this meeting set up a fraudulent scheme between the Mitchells and Wedtech's officers to disburse corporate funds for an unlawful purpose, i.e., obstruction of the investigation. The fifth count charged Michael with wire fraud and was based on Strum's September 25, 1984, call to Loscalzo. The fraudulent scheme alleged was Loscalzo's breach of his fiduciary duty to Wedtech by referring the Mitchells' employment so that he could receive a kickback of one-third of the fee. The government maintained that this was a separate scheme to defraud Wedtech of corporate funds.

Jury selection commenced on October 21, 1987. The original venire panel was dismissed, however, because some jurors were tainted by racist comments made in the jurors' lounge. Jury selection from a new venire commenced on October 26. Following voir dire, the government used seven of its ten peremptory challenges to strike black members of the panel. The jury eventually selected contained nine whites and three blacks, one of whom was the foreperson.

Following two days of deliberations, the jury acquitted the Mitchells of count one, conspiracy to obstruct a congressional investigation, and of the wire fraud charged in count four. The brothers were convicted on count 2, endeavoring to obstruct a congressional investigation, and on the wire fraud charged in count 3. Michael was also convicted on the separate wire fraud charged in count five. After denial of their post-trial motions, Michael and Clarence were both fined and sentenced to 30

---

**2.** Clarence Mitchell, who eventually received $10,000 of this fee, is not licensed to practice law.

months on each count, with the sentences to run concurrently. This appeal followed.

## II.

Appellants raise several arguments. Their primary contention is that they did not "corruptly" endeavor to influence a House investigation as that phrase is used in 18 U.S.C. § 1505. They maintain that since no "illegal means" of influence, such as bribery or extortion, was ever contemplated, their agreement to stop the investigation solely by their ability to influence Congressman Mitchell through their close relationship is not a corrupt endeavor. Rather, they contend that they were like any other lobbyists with ties to a member of Congress who attempt to use those ties to the benefit of their clients. Alternatively, they argue that even if their actions did constitute a corrupt endeavor, the investigation they were hired to stop was not a congressional investigation for purposes of § 1505. They maintain that absent proof that the investigation had been formally authorized pursuant to Committee rules at the time the corrupt endeavor occurred, it cannot be punished under the statute.

Appellants also contend that their wire fraud convictions are fatally flawed because they are legally dependent on their improper convictions on the § 1505 charge. They argue that if the § 1505 convictions are overturned, there can be no fraudulent scheme to disburse corporate funds for an unlawful purpose. Alternatively, they maintain that the indictment does not allege a scheme to defraud of property rights that is punishable by the wire fraud statute and, that even if it did, the government failed to prove that Strum's telephone calls

were made in furtherance of that scheme. Michael Mitchell contends that his individual wire fraud conviction is also improper because at the time the telephone call in question was made there was no fraudulent scheme in esse for which he can be convicted. Finally, appellants allege, *inter alia,*[3] that their right to the equal protection of law was violated by the prosecution's racially-discriminatory use of its peremptory jury strikes. We begin our analysis by addressing appellants' arguments against their convictions for endeavoring to obstruct a congressional investigation.

Section 1505 of Title 18 of the U.S.Code provides in pertinent part:

Whoever corruptly, ... endeavors to influence, obstruct, or impede ... the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Appellants' argument that the use of their close relationship with their uncle to influence the investigation cannot constitute a corrupt endeavor is untenable. Such a narrow interpretation of § 1505 runs contrary to the well-established rule that the omnibus clauses of federal obstruction statutes should be broadly construed. *United States v. Laurins,* 857 F.2d 529, 536 (9th Cir.1988) (18 U.S.C. § 1505), *cert. filed,* 57 U.S.L.W. 3655 (March 17, 1989); *United*

---

**3.** We have reviewed appellants' other contentions and found them meritless. Even if there were a problem of multiplicity in charging appellants with both counts 1 and 2, an issue we do not decide, appellants suffered no harm because of their acquittal on count 1. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (double jeopardy clause protects against double punishments). We also find no error in the district court's ruling under Fed.R.Evid. 106 that the excerpt of Loscalzo's grand jury testimony that appellants sought to introduce could not be introduced

unless it was accompanied by other excerpts to place it in context. *United States v. Jamar,* 561 F.2d 1103, 1108–09 (4th Cir.1977). Finally, because appellants failed to make a showing of government misconduct, the prerequisite of any defense immunity request, it was not error for the district court to deny appellants' request to grant use immunity to Mariotta. *United States v. Tindle,* 808 F.2d 319, 325–26 (4th Cir.1986) (later unrelated appeal 860 F.2d 125 (4th Cir. 1988) *cert. filed* 57 U.S.L.W. 3590 (February 17, 1989)).

*States v. Lester,* 749 F.2d 1288, 1293 (9th Cir.1984) (18 U.S.C. § 1503); *United States v. Reeves,* 752 F.2d 995, 998–1000 (5th Cir.), *cert. denied,* 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985) (26 U.S.C. § 7212); *United States v. Browning,* 572 F.2d 720, 725 (10th Cir.1978), *cert. denied,* 439 U.S. 822, 99 S.Ct. 88, 58 L.Ed.2d 114 (1978) (18 U.S.C. § 1505).[4] The rationale for this rule is compelling:

> The obstruction of justice statute was drafted with an eye to "the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined."

*United States v. Griffin,* 589 F.2d 200, 206–07 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 48, 62 L.Ed.2d 32 (1979) (citation omitted) (interpreting § 1503). Accordingly, several courts have held that means, other than "illegal means," when employed to obstruct justice fall within the ambit of the "corrupt endeavor" language of federal obstruction statutes. *See United States v. Partin,* 552 F.2d 621, 642 n. 26 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) (bribery not prerequisite to violation of § 1503); *Reeves,* 752 at 998–1000 (filing of improper tax liens violates 26 U.S.C. § 7212); *Browning,* 572 F.2d at 725 (no need for threat of violence to violate § 1505). In interpreting § 1503, the Fifth Circuit has held that "any effort or any act, however contrived," as long as it was made with the

requisite intent to obstruct or interfere, violates the statute. *United States v. Cioffi,* 493 F.2d 1111, 1119 (5th Cir.), *cert. denied,* 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974). We find this reasoning persuasive in interpreting § 1505. The proper inquiry is whether a defendant had the requisite corrupt intent to improperly influence the investigation, not on the means the defendant employed in bringing to bear this influence. *United States v. Cintolo,* 818 F.2d 980, 991–93 (1st Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 259, 98 L.Ed. 2d 216 (1987) (interpreting § 1503). Accordingly, we hold that any endeavor, including the promised exploitation of a special relationship with the chair of the investigating committee, when done with the requisite intent to corruptly influence a congressional investigation, violates § 1505.[5] *See generally United States v. Fasolino,* 586 F.2d 939, 941 (2nd Cir.1978) (endeavor to exploit special relationship with district court judge held to violate § 1503); *United States v. Baker,* 611 F.2d 964 (4th Cir.1979) (advice to grand jury witnesses to take the fifth amendment can violate § 1503 if it is given with a corrupt intent); *Cintolo,* 818 F.2d at 993 (otherwise lawful means can violate § 1503 if done with corrupt intent).

In applying these principles to the case at bar, it is clear that the circumstances of appellants' employment—a hand-delivered $50,000 check camouflaged by a

---

**4.** It is clear that 18 U.S.C. § 1505, 18 U.S.C. § 1503 (obstruction of judicial proceedings), and 26 U.S.C. § 7212 (obstruction of administration of the tax code) are obstruction statutes with similarly worded omnibus provisions that are intended to serve comparable goals. *Reeves,* 752 F.2d at 998–1000. We agree with our sister circuits that the identity of purpose among these provisions makes case law interpreting any one of these provisions strongly persuasive authority in interpreting the others. *See Laurins,* 857 F.2d at 536; *United States v. Martin,* 747 F.2d 1404, 1409 (11th Cir.1984); *Reeves,* 752 F.2d at 998.

This conclusion leads us to reject appellant's contention that case law interpreting § 1503 is inapposite because of the inherent differences between the judicial and legislative branches. While we agree with the premise underlying this position—that access to members of Congress is necessarily less closely guarded than ex

parte access to judges or jurors—we do not agree that this renders § 1503 precedents unavailing. As the trial court noted, such a position would overlook the "numerous similarities" between legislative and judicial fact-finding which make it analytically sound to view the two obstruction statutes analogously.

**5.** We reject appellants' contention that such a broad interpretation of § 1505 renders it unconstitutionally vague. The statute expressly prohibits corrupt endeavors to influence congressional investigations. This language is more than adequate to forewarn a reasonable person that any attempt to improperly influence a congressional investigation is illegal. *See United States v. Jeter,* 775 F.2d 670, 677–79 (6th Cir.), *cert. denied,* 475 U.S. 1142, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1985) (rejecting similar argument under § 1503).

phony retainer letter, paid on promises that appellants could "get rid of the problem" and followed by no legitimate services rendered—coupled with their self-professed personal access to their uncle, abundantly support the jury's verdict that appellants intended to corruptly influence the investigation. Likewise, we reject the argument that these convictions infringe on appellants' first amendment right to lobby members of Congress. Clearly, legitimate lobbying activities, even those directed towards members of Congress with whom the lobbyist has close ties, do not violate § 1505. However, the evidence in this case more than adequately supports the jury's conclusion that appellants were not paid for their advocacy skills, but rather were paid for their ability to thwart the investigation solely through their ties to their uncle.[6] Such a use of influence constitutes a corrupt endeavor punishable under § 1505.

█ Appellants' argument that the lack of proof of formal committee authorization places this investigation outside the protections of § 1505 also rests on an unrealistically narrow construction of the statute. This argument is based on the premise that for a congressional investigation to be a "due and proper exercise of the power of inquiry" under the statute, it must first have been formally authorized pursuant to the letter of the investigating committee's rules. We disagree.

Although we have found no direct authority for determining exactly what is a house investigation for purposes of § 1505, several courts have addressed the issue of what is an administrative proceeding under the statute. These decisions have uniformly held that this term should be construed broadly to effectuate the statute's purposes. *See generally,* Annotation, Construction and Application of 18 U.S.C. § 1505 Making it a Federal Offense to Ob-

struct Proceedings before Federal Departments or Agencies or Congressional Committees, 8 ALR Fed. 893 (1971). Indicative of these decisions is the Eighth Circuit's holding in *Rice v. United States,* 356 F.2d 709 (8th Cir.1966). There, the court was confronted by a claim that a § 1505 prosecution could not lie because the obstructive activities occurred before a formal complaint had been filed with the Labor Board. The court rejected this narrow interpretation, refusing to read the statute in a way that would produce an "absurd result or one which defeats the purpose for which the Act was passed." *Id.* at 712 (citation omitted). Instead, the court reasoned that:

"Proceeding" is a comprehensive term meaning the action of proceeding ... including all steps and stages in such an action from its inception to its conclusion.

In our view, it would be absurd to hold that Congress meant to proscribe interference with the administrative process after a Labor Board proceeding had reached a certain formal stage and let go unpunished individuals who obstruct earlier preliminary proceedings.

*Id.* at 712; *see also United States v. Fruchtman,* 421 F.2d 1019 (6th Cir.), *cert. denied,* 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed. 2d 86 (1970) ("proceeding" given "broad scope"). We find this reasoning persuasive in regard to congressional investigations as well and reject appellants' formal authorization argument. The question of whether a given congressional investigation is a "due and proper exercise of the power of inquiry" for purposes of § 1505 can not be answered by a myopic focus on formality. Rather, it is properly answered by a careful examination of all the surrounding circumstances. If it is apparent that the investigation is a legitimate exercise of investigative authority by a congressional committee in an area within the committee's purview, it should be protected by § 1505. While formal authorization is certainly a

---

**6.** Appellants' lobbying theory was squarely presented to, and rejected by, the jury. The lower court instructed:

A lobbyist is a person who in return for money or other thing of value agrees to attempt to influence, directly or indirectly, the passage or defeat of any legislation which may in-

clude investigations by the Congress. Lobbying is lawful activity permitted and regulated by the Congress. A lobbyist may not, however, endeavor corruptly to influence, obstruct or impede a Congressional investigation.

factor that weighs heavily in this determination, its presence or absence is not dispositive. To give § 1505 the protective force it was intended, corrupt endeavors to influence congressional investigations must be proscribed even when they occur prior to formal committee authorization.[7]

Applying these principles to the case at hand, all of the circumstances surrounding this investigation point to the conclusion that appellants' corrupt endeavor was directed towards a legitimate House investigation. The investigation was instigated by the chair of a House committee that unquestionably has jurisdiction over the subject matter of the inquiry. The letter from Congressman Mitchell to the SBA expressly said that "[t]his Committee is presently conducting an investigation" and referred to the Small Business Act for its authority to do so. Furthermore, the investigation was handled by the chief investigator of the Small Business Committee on a continuing basis for several months. The fact that the government did not present additional proof that the investigation had been formally authorized pursuant to the letter of the House rules does not detract from the conclusion that this was a congressional investigation. Accordingly, we hold that the investigation instigated by Congressman Mitchell was an investigation by the Small Business Committee of the House that was protected by § 1505.[8]

## III.

None of appellants' arguments concerning their convictions on count three for violation of 18 U.S.C. § 1343 gives us much pause. First, because we have held that the convictions under § 1505 were proper, their argument that this conduct cannot serve as the unlawful purpose which was the focus of the wire fraud count also must fail.

Second, we find equally unpersuasive their contention that the indictment did not allege a scheme to defraud of property rights and thus, did not state a fraud cognizable under 18 U.S.C. § 1343. In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987), the Supreme Court held that the mail fraud statute, 18 U.S.C. § 1341, and by analogy the wire fraud statute, is "limited in scope to the protection of property rights." Consequently, prosecution under either statute "requires a finding that the scheme *defrauded* or *intended to defraud* someone of money or property." *United States v. Mandel*, 862 F.2d 1067, 1072 (4th Cir.1988).

The indictment and proof in this case certainly meet this test. The indictment alleged that appellants schemed to defraud "Wedtech and its shareholders of money and property by obtaining corporate funds for an unlawful purpose." The trial court's instructions to the jury likewise required them to find beyond a reasonable doubt that appellants had devised or intended to devise a scheme "to defraud or to attempt to defraud, another of property rights or to obtain money or property by means of false or fraudulent pretenses and

---

7. Appellants' argument to the contrary relies on a line of authority, typified by *Gojack v. United States*, 384 U.S. 702, 86 S.Ct. 1689, 16 L.Ed.2d 870 (1966), which has strictly construed the contempt of Congress statute, 2 U.S.C. § 192, to require formal authorization of a committee inquiry before a witness can be held in contempt for refusing to answer questions posed by the committee. We find that this reliance is misplaced. Unlike contempt statutes, obstruction of justice statutes are uniformly given a broad construction. Further, the language of 2 U.S.C. § 192 refers specifically to inquiries, while the language of § 1505 refers to obstruction of inquiries *or* investigations. This distinction makes a difference. To have any meaning at all, the inclusion of this language must evidence Congress' intent for § 1505 to be of broader sweep than 2 U.S.C. § 192.

8. This conclusion is supported by a common sense recognition of the nature of this crime. Corruptly endeavoring to influence a congressional investigation is a crime of specific intent and, where it is clear that a defendant had this requisite intent, he should not be able to escape punishment through "empty technicalities." *United States v. Simmons*, 591 F.2d 206, 208 (3rd Cir.1978) (interpreting § 1503). The evidence presented at appellant's trial demonstrated this "specific intent" and appellants now seek to avoid the consequences of their intentions through just such a technicality. We will not read § 1505 to countenance such a result.

representations." Finally, the evidence showed that appellants received $50,000 of Wedtech's money, under the guise of a phony retainer letter, to stop the Small Business Committee's investigation. This is clearly a scheme punishable by the wire fraud statute.[9]

■ Third, the government's proof adequately supported the conclusion that Strum's telephone calls were made to set up the October 1, 1984, meeting which brought the principals of the scheme together. These calls furthered the scheme and arguably did more than any other single act in bringing the scheme to fruition. And, after the September 25 meeting between Strum and Michael Mitchell, it was foreseeable to Michael that Strum would use the wires to contact him to close the deal. Thus, both he and Clarence can properly be charged under 18 U.S.C. § 1343. *United States v. Toney,* 598 F.2d 1349, 1355 (5th Cir.) *cert. denied,* 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980).

As to Michael's conviction on count five, his contention that at the time Strum made the September 25 call to Loscalzo, the kickback scheme was not yet in existence, and consequently, the call could not have been made in its furtherance, is equally unsupported by the evidence. Considering the fact that there was a longtime fee-splitting relationship between Michael and Loscalzo, the fact that Loscalzo referred Wedtech to the Mitchells, the fact that Michael was willing to accept the referral for a substantial fee, and the fact that Michael was made aware of Loscalzo's employment by Wedtech prior to the call in question, the jury could have reasonably concluded that the scheme was set into motion before the call was made and that it was foreseeable to Michael that such a call would occur.[10] The evidence presented at trial adequately supports the conviction on count five.

## IV.

■ Lastly, we turn to appellants' argument that the prosecution used its peremptory strikes to remove black jurors in a racially discriminatory manner. In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court made clear that the prosecution in a criminal case cannot use its peremptory challenges in jury voir dire to strike potential jurors solely on account of their race. To ensure that such discrimination does not go unchecked, the Court established an evidentiary scheme which allows a defendant to establish a three part prima facie case of discrimination. First, he must show that he is a "member of a cognizable racial group." *Id.* at 96, 106 S.Ct. at 1722–23. Second, the prosecutor must have used his peremptories to strike venire members of the defendant's race. *Id.* Third, the defendant must prove that these facts, plus any other relevant circumstances "raise an inference" that the prosecutor excluded the veniremen on account of race. *Id.* Once this prima facie case has been made, the burden shifts to the state to come forward with racially-neutral explanations for the strikes. *Id.* If the state's proffered reasons rebut the prima facie case, then the trial court must determine if the defendant has proven racial discrimination without the aid of any presumption.

In applying these principles to appellants' voir dire, the trial court found that they had made their prima facie case. We agree. Appellants are black. The prosecution used seven of its ten peremptories to strike black veniremen. Furthermore, a previous jury panel had to be dismissed because of racially inflammatory remarks made in the jurors' lounge. We find that under these circumstances, a prima facie *Batson* violation has been made.

---

9. The fact that Wedtech's officers were fully aware of the real purpose of the payment to appellants does not change the fact that Wedtech was defrauded of the funds. The fraud was perpetrated on the corporation and its shareholders not on its officers.

10. We also reject Michael's argument that because the entire $50,000 was fraudulently procured, his subsequent kickback of one-third of those funds could not perpetuate a separate fraud. The same funds can certainly be part of two related but separate fraudulent schemes, each punishable under 18 U.S.C. § 1343.

■ We also agree with the trial court's conclusion that the government's racially neutral explanations for the strikes rebutted the *prima facie* case. The government maintained that four of the black jurors were struck because they resided in Congressman Mitchell's home district. Because of the Congressman's tremendous popularity with his constituency, the prosecution felt that these jurors would give undue weight to the Congressman's testimony on his nephews' behalf. The government explained that the fifth black juror was struck because he resided in the district that Michael Mitchell represented for many years on the Baltimore City Council and because of an equivocal response that he made when asked if he had been exposed to any pretrial publicity of the case. The sixth juror was struck because of her strong negative reaction to the press reports she had seen regarding the racist comments made during the first jury voir dire. The government reasoned that she might be prejudiced against the prosecution because of the remarks. Finally, the seventh juror was struck because he had a criminal record.

■ Because appellants' prima facie case was rebutted, the trial court was left with the task of determining if they had proven purposeful discrimination. It determined that they did not. In reaching this decision as to the first five jurors, the lower court focused on the fact of the Mitchell family's political prominence and its remarkable popularity in the Congressman's and the brothers' home districts. While recognizing that this reason could be pretextual because these areas are also predominately black, the trial court assessed all of the circumstances, including the prosecutor's credibility, and concluded that the government's use of this criterion was legitimate. The court also found that appellants had not shown purposeful discrimination as to the remaining two jurors.

The lower court's finding on the issue of discriminatory purpose is one of fact that we may not overturn unless it is clearly erroneous. *Tindle,* 860 F.2d at 129; *United States v. Hamilton,* 850 F.2d 1038, 1040 (4th Cir.1988) *cert. dismissed,* —— U.S. ——, 109 S.Ct. 1564, 103 L.Ed.2d 931 (1989). Besides the facial validity of the state's racially neutral explanations for the use of its strikes, we note that the jury eventually impaneled contained three blacks, including the foreperson. This is supportive of the inference that the government did not act with racially discriminatory intent especially in view of the fact that the government used three of its peremptories to strike whites. Further, the venire of 38 jurors contained 11 blacks (29%) while appellants' jury of 12 contained 3 blacks (25%). While such statistics are not dispositive, they lend support to the trial court's conclusion that no equal protection violation occurred. On this record, we cannot say that the trial court's decision was clearly erroneous. Accordingly, we affirm the lower court and hold that appellants' jury was not selected in violation of *Batson.*

## V.

In sum, we affirm appellants' convictions of violating 18 U.S.C. § 1505 because the evidence at trial supported the jury's verdict that they corruptly endeavored to influence a House investigation through their close relationship with the chair of the investigating Committee. We also uphold appellants' convictions for violating 18 U.S.C. § 1343 through their participation in a scheme to defraud Wedtech of a $50,000 fee as well as Michael Mitchell's wire fraud conviction for his part in the kickback of one-third of the fee to a Wedtech employee. Finally, we conclude that appellants' right to the equal protection of law was not violated through the prosecution's use of its peremptory strikes in jury voir dire. Accordingly, we affirm the judgment of the lower court in all respects.

AFFIRMED.