14 F.3d 598
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
James WILLIAMSTON, a/k/a Jimmy, Defendant-Appellant.
United States of America, Plantiff-Appellee,
v.
Carvel Larry Jones, Jr., Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Sean Andre Wilson, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Namond Earl Williams, Defendant-Appellant.
 Nos. 91-5163, 92-5018, 92-5031, 92-5044.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 28, 1993.
Decided Dec. 21, 1993.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore.
 James Joseph Nolan, Jr., Harry D. McKnett; James Bernard Kraft, Neidig & Kraft, for appellants.
 Katharine J. Armentrout, Asst. U.S. Atty., for appellee.
 William Henry Porter, U.S. Atty., for appellee.
 D.Md.
 AFFIRMED.
 Before RUSSELL and HALL, Circuit Judges, and CLARKE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 The four appellants were among twenty-three (23) individuals named in a thirty-six (36) count indictment alleging a conspiracy to distribute heroin and cocaine in violation of 21 U.S.C. Sec. 841(a)(1); among others charges, the indictment also contained substantive violations for possession and distribution of heroin and cocaine in violation of 21 U.S.C. Sec. 841(a)(1), use of firearms in the course of drug trafficking crimes under 18 U.S.C. Sec. 924(c), money laundering in violation of 18 U.S.C. Sec. 1956(a)(1)(B)(i), and unlawful possession of firearms in violation of 18 U.S.C. Sec. 922(g)(1).[1] The four (4) appellants now raise a number of issues, some of which are common to each of them, stemming from their convictions in a joint trial. For the reasons stated below, we reject the merits of those arguments and affirm the judgment of the district court.
 
 I.
 
 2
 From 1986 until his arrest in April, 1990, Linwood Williams headed a large-scale drug distribution organization in the Baltimore, Maryland area. The operation included many of his friends and family, such as his nephew, Namond Williams, who in turn brought his acquaintances, including appellants Carvel Jones and Sean Wilson, into the operation.
 
 
 3
 In 1989, the Drug Enforcement Administration ("DEA"), the Internal Revenue Service ("IRS"), and the Baltimore City Police Department ("BCPD") undertook a combined investigation of this drug operation. Investigators used various means, including interviews, reviews of phone records, and electronic surveillance, to gather information on the organization's transactions, whereabouts, and methods. The investigation, as shown by the evidence presented at trial, revealed that Linwood Williams headed a wholesale heroin distribution organization, which supplied street-level dealers in the Baltimore area. Linwood Williams would negotiate for raw heroin from importers himself and direct others, such as Namond Williams, to actually pick up the shipments and deliver payments.
 
 
 4
 Simultaneous to Linwood Williams' distribution scheme, Namond Williams, in conjunction with his friends Wilson and Jones, ran a street-level heroin distribution organization. As part of this operation, Namond Williams opened a car wash, "Namond's Polish King," in East Baltimore. Electronic surveillance from phone taps and "bugs" planted in the facility disclosed the occurrence of heroin and cocaine transactions by Namond Williams and others.
 
 
 5
 During this time, appellant James Williamston, who was a nephew of Linwood Williams' cousin, Gerald Gray, began to assist Gray in selling heroin supplied by Linwood Williams. Electronic surveillance and the testimony of witnesses revealed that Williamston would cut the raw heroin and ensure that "stash" houses in Baltimore were adequately supplied. In the spring of 1990, BCPD officers raided several of the Gray-Williamston "stash" houses; in the process, the police made several arrests and recovered numerous bags of heroin, vials of crack cocaine, and handguns. Williamston himself was arrested when 177 bags of street-ready heroin, $2,000 in one dollar bills, and a tally book were discovered by BCPD during a stop of his vehicle for speeding.
 
 
 6
 On April 17, 1990, investigators executed twenty-six (26) warrants and arrested numerous individuals. At Linwood Williams' home, they found a large amount of money, a gun, and drug-packaging paraphernalia. At Namond Williams' apartment they found sixty-two (62) bags of 19% pure cocaine, 27.42 grams of 46% pure heroin in raw form, and 17.29 grams of 3% heroin, and a variety of distribution supplies. In Williamston's apartment, they recovered 122 bags of heroin, 63 vials of cocaine, and $2,744 in cash.
 
 
 7
 The grand jury returned a Second Superseding Indictment on October 10, 1990 alleging the conspiracy and thirty-five (35) other counts against the twenty-three (23) defendants.[2] Prior to trial, both prosecutors and attorneys for the defendants filed a plethora of motions, including requests for severance, suppression of evidence obtained by electronic intercept, and use of an anonymous jury. The trial court denied the first two, but, at the behest of the United States Attorney, agreed to the use of an anonymous jury so long as certain conditions were met.[3]
 
 
 8
 On December 10, 1990, trial commenced for fourteen (14) of the defendants, including the four (4) appellants. At the conclusion of a lengthy voir dire process, the defendants objected to the United States' use of its peremptory strikes to rid the jury of all residents and employees of Baltimore City. The district court denied the challenge and swore in the jury. On March 7, 1991, the case went to the jury, which had not been sequestered.[4] Two days later, the jury requested that it be allowed to use tapes of wiretaps and/or transcripts of the tapes to facilitate its deliberations. After removing government prepared indexes from the transcripts, the court, over defendants' objections, allowed use of both the tapes and transcripts.
 
 
 9
 In its March 20 verdict, the jury found appellants Carvel Jones, Sean Wilson, and Namond Williams guilty of the conspiracy charge. It found appellant James Williamston guilty of possession with intent to distribute heroin and cocaine. In addition to the conspiracy, it found appellant Namond Williams guilty of two counts of possession with intent to distribute heroin and cocaine and one count of money laundering. After conducting intensive sentencing hearings, the trial court sentenced Williamston to prison for a term of 240 months; Jones and Wilson for 188 months each; and Namond Williams for 50 years on Count 1, 20 years on Count 5, 20 years on Count 11, and 20 years on Count 13.[5] Thereafter, the four appellants entered timely notices of appeal. They challenge the determinations of the trial court on several issues including the use of the government's peremptory strikes, the propriety of the electronic surveillance used by investigators, the use of the wiretap transcripts by the jury, and various sentencing issues.
 
 II.
 
 10
 All four appellants contend that their convictions should be overturned because the United States unconstitutionally used its peremptory strikes during jury selection in violation of Batson v. Kentucky, 476 U.S. 79 (1986), which prohibits prosecutors from striking potential jurors solely on account of their race. The challenge stems from a unique jury selection process where the trial court ordered that no names or addresses of jurors be released to the parties. Only a potential juror's identification number, postal zip code, and a brief description of the juror's occupation were given to the United States and the defendants. Based on this information and the responses during voir dire, the United States used thirteen (13) of its possible eighteen (18) challenges to strike seven (7) blacks and six (6) whites from the jury panel. The resulting jury consisted of eight (8) white and four (4) black jurors.[6]
 
 
 11
 At the conclusion of the selection process, the defendants raised a Batson challenge, alleging that the United States struck jurors in a racially impermissible fashion. In response, the United States offered the rationale it employed in exercising the peremptory strikes. First, it asserted that it struck all panel members who were residents of Baltimore City (four black and two white) because it feared that they might be recognized and intimidated by defendants' acquaintances who were not incarcerated. Second, it struck one black panel member who worked for Baltimore City and could not understand the court's questions. Third, it struck all persons who worked in Baltimore City (one black and one white) for security reasons. Fourth, it struck both persons (one black and one white) who were social workers.[7]
 
 
 12
 After considering the United States' rationale and hearing arguments by the defendants on whether the locale-based reasons were pretextual, the district court refused the defendants' challenge based upon the "clearly legitimate reasons, neutral reasons" of the prosecution. The judge found that despite the use of an anonymous jury there were further jury-tampering concerns that provided nonracial bases for the United States' strikes.[8]
 
 
 13
 In asserting a Batson challenge, the burden is generally upon the defendant to make out a prima facie case that the prosecutor exercised its peremptory strikes based upon race. Batson, 476 U.S. at 96-97; accord Hernandez v. New York, 111 S.Ct. 1859, 1866 (1991) (plurality opinion).[9] Only then does the burden shift to the prosecution to state a "race-neutral" reason for the juror strikes at issue. Batson, 476 U.S. at 97; accord Hernandez, 111 S.Ct at 1866. Finally, the trial court must determine whether the defendant has carried the burden of establishing purposeful discrimination. Batson, 476 U.S. at 98; accord Hernandez, 111 S.Ct at 1866. The trial court's conclusion in this regard is a finding of fact, which is to be given great deference.
 
 
 14
 Batson, 476 U.S. at 98 n.21. Therefore, we may not overturn it unless it is clearly erroneous. United States v. Mitchell, 877 F.2d 294, 303 (4th Cir.1989).
 
 
 15
 Where, as here, the prosecution offers a race neutral explanation for the peremptory challenges and the trial court rules on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant made a prima facie showing of discrimination becomes moot. Hernandez, 111 S.Ct. at 1866. In offering its explanation under the second step of Batson, the prosecutor's rationale must be "based on something other than the race of the juror" and the offered reason will be "deemed race neutral" unless there is a discriminatory intent inherent in the explanation. Id. In the third step, since the Batson challenge is really one based upon equal protection grounds, the court should deny the challenge unless there is proof of racially discriminatory intent or purpose. See Washington v. Davis, 426 U.S. 229, 239 (1976); see also United States v. Uwaezhoke, 995 F.2d 388, 393 (3d Cir.), petition for cert. filed, 62 U.S.L.W. 3299 (U.S. Oct. 6, 1993) (No. 93-571) (showing intent to discriminate is an essential element of Batson challenge).
 
 
 16
 Here, the United States offered a locale-based explanation for the strikes at issue, i.e., those persons having a connection to Baltimore City faced a risk of harm or intimidation if they served and such service would enhance the chances of jury tampering.[10] To demonstrate the possibility of tampering, the United States presented evidence of numerous prior occasions where Linwood Williams, his family, and his friends had used violence to operate their drug organization and intimidation of jurors to gain acquittals in state court prosecutions. The United States thus feared that if friends or family of the defendants happened to recognize or know someone on the jury that, regardless of the anonymous nature of the selection process, tampering might occur. As a result it sought to lessen the likelihood of this by removing those persons from the jury who had contact with the area where the defendants lived and operated--Baltimore City.
 
 
 17
 In United States v. Mitchell, 877 F.2d 294 (4th Cir.1989), this Court upheld locale-based peremptory strikes. In Mitchell, the government used seven (7) of its ten (10) strikes to remove black veniremen, four (4) of which were struck because they lived in the Congressional district of a popular black Congressman who was to testify for the defense at that trial. Id. at 302. In affirming the trial court's finding that there was no purposeful discrimination, we recognized that the locale reason "could be pretextual because these areas are also predominately black," but upheld the trial court's determination due to the Congressman's "political prominence and [his] remarkable popularity." Id. at 303. Furthermore, we noted that the existence of three (3) black persons on that jury, including the foreperson, while not dispositive, supported the"inference that the government did not act with racially discriminatory intent, especially in view of the fact that the government used three of its peremptories to strike whites." Id. Likewise, in United States v. Tindle, 860 F.2d 125 (4th Cir.1988), cert. denied, 490 U.S. 1114 (1989), this Court upheld a locale based strike where the prosecutor expressed concern about a venireman working at a shopping mall that was closely associated with drug trafficking. Other circuits are in agreement that peremptory challenges can be exercised on locale grounds. See, e.g., Uwaezhoke, 995 F.2d 388 (upholding peremptory strike of black venireman because she was more likely to have had exposure to drug trafficking situation in Newark); United States v. Briscoe, 896 F.2d 1476, 1488-89 (7th Cir.), cert. denied, 498 U.S. 863 (1990) (upholding peremptory strike of black venireman who lived close to key witnesses in trial); United States v. Davis, 871 F.2d 71, 72-73 (8th Cir.1989) (upholding prosecutor's explanation that he considered four neutral items in striking venireman, including that he lived in defendant's neighborhood).[11]
 
 
 18
 In this instance, the defendants argue that because 60% of Baltimore City's population is black, the locale argument is pretextual and therefore that the trial court erred by accepting the United States' explanation and refusing to find purposeful discrimination. We disagree. First of all, there were serious security concerns regarding this trial that were grave enough to lead the trial judge to use an anonymous jury. The trial court did not commit clear error when it found that the United States had legitimate security concerns about Baltimore City residents and workers that were not fully solved by the use of an anonymous jury, especially in light of the evidence presented as to previous violence and jury tampering by some of the defendants. Second, the prosecutors struck all individuals from the venire panel who lived or worked in Baltimore City, not just black individuals. Third, while not dispositive, it is significant that four (4) of the twelve (12) members of the appellants' jury were black.
 
 
 19
 For these reasons, we hold that the trial court was not clearly erroneous in finding that the United States had set forth race-neutral reasons for exercising its peremptory strikes. Likewise, the court did not commit clear error in finding that there was no purposeful discrimination on the United States' part in striking the black veniremen. The appellants' Batson challenge is therefore denied.
 
 III.
 
 20
 The second principal issue presented by each of the appellants involves whether the district court erred in refusing to suppress electronically intercepted communications. From late 1989 to April, 1990 government investigators connected wiretaps to about twenty-five (25) telephones and contact pagers and planted "bugs" in Namond Williams' car wash resulting in the intercept of thousands of communications between the appellants and others believed to be involved in the heroin conspiracy. The appellants' major complaint about these intercepts is the manner in which they were approved.
 
 
 21
 On December 14, 1989, prior to wiretap approval by the Department of Justice or a court, John S. Taylor, the DEA Assistant Special Agent in Charge in Baltimore, contacted DEA headquarters seeking permission to perform emergency deputations of three BCPD officers, so that they might help monitor wiretaps which were to be operational the next day. Taylor spoke to Gerald Medina, Chief of the DEA's Task Force Section, Operations Division, who granted him authority to perform the emergency deputations.
 
 
 22
 On December 15, 1989, the government applied for and received authorization from Judge John R. Hargrove to intercept communications related to Linwood Williams' drug transactions. The following day, the DEA began to intercept communications at the direction of Special Agent David Rivello. For the next 120 days, he, other DEA agents, and the deputized BCPD officers monitored transmissions from their post in DEA's Baltimore office.
 
 
 23
 Prior to trial, the defendants sought to have the trial court suppress the intercepted communications due to faulty deputation of the BCPD officers. The court found that rules and regulations pertaining to deputations of local officers had not been complied with, but determined that there had not been the slightest prejudice to the defendants, because the substantive conduct of the wiretaps had been legitimately accomplished. J.A. 359-60.
 
 
 24
 The appellants now challenge several aspects of the wiretaps and the trial court's decisions in regards to them, including (1) the adequacy of the authorizing court's factual determination as to the need for these intercepts, (2) the procedures by which the BCPD officers were deputized, and (3) the adequacy of DEA supervision of the local officers.
 
 
 25
 A. The Authorizing Court's Factual Determination
 
 
 26
 Prior to granting authorization for a wiretap, Congress has directed that a judge must determine whether "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. Sec. 2518(3)(c). In the order authorizing the wiretaps in this matter, the judge stated that
 
 
 27
 [i]t has been adequately established that normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous to employ.
 
 
 28
 J.A. 154. The appellants assert that this finding is insufficient to satisfy Sec. 2518(3)(c) because it simply quotes the provision's disjunctive language, in essence making the order a multiple choice finding. They also contend that it was error for the district court to uphold this finding, because the second alternative ("reasonably appear unlikely to succeed if continued") is not a finding for which the statute authorizes a wiretap.
 
 
 29
 We find no merit to this argument. The appellants have not provided a prior case where a court has found an order insufficient under Sec. 2518(3)(c) for making similar, conclusory findings or for including this extra "continuation" finding. To the contrary, several other circuits have upheld orders which included this very language. See, e.g., United States v. Cooper, 868 F.2d 1505, 1508 (6th Cir.), cert. denied, 490 U.S. 1094 (1989) (order used disjunctive language and "continuation" finding); United States v. Martinez, 588 F.2d 1227, 1233 (9th Cir.1978) (same); United States v. Rotchford, 575 F.2d 166, 173 (8th Cir.1978) (same); see also United States v. Apodaca, 820 F.2d 348, 350 (10th Cir.), cert. denied, 484 U.S. 903 (1987) (court found affidavit containing "continuation" language adequate support for wiretap order). The Ninth Circuit in Martinez also stated that absent some requirement that specific findings be made by the authorizing judge, these "conclusory" findings that "merely repeat[ ] the statutory language" are adequate so long as the record demonstrates that "the order was based on full consideration of the information contained in the application." 588 F.2d at 1233.
 
 
 30
 We agree with these prior holdings that recitation of the disjunctive statutory language in the authorizing order is adequate if the order shows that the court considered the information in the application. Here the order itself states that it fully considered the information in the application. Likewise, we agree that the inclusion of the "continuation" language does not cause the finding to be inadequate. Therefore, we find no error in the district court's refusal to suppress the communications on Sec. 2518(3)(c) grounds.
 
 B. Deputation of the BCPD Officers
 
 31
 The appellants next assert that the intercepted communications should have been suppressed by the district court because DEA failed to follow rules and regulations for properly deputizing local officers to help monitor wiretaps.[12] The normal procedure for deputizing local officers includes the DEA's submission of names to DEA headquarters and approval by the Department of Justice ("DOJ"). In an emergency, though, the DEA can deputize local officers without the approval of DOJ. In this instance, the appellants contend that the emergency deputations were faulty because Medina had not been delegated the authority to further delegate the performance of emergency deputations and because DEA failed to follow its own deputation procedures.
 
 1. Medina's Authority
 
 32
 Congress has authorized the Attorney General of the United States ("USAG") to empower DEA employees and state and local police officers to carry out certain types of law enforcement functions, including making arrests and carrying firearms. See 21 U.S.C. Sec. 878. Pursuant to this power, the USAG has delegated to the DEA Administrator his power to enlist the assistance of state and local police. See 28 C.F.R. Sec. 0.100(b). Furthermore, the DEA Administrator may redelegate his deputation power to his subordinates. See id. Sec. 0.104.
 
 
 33
 Here the appellants assert that Medina had not been delegated this authority from the DEA Administrator, John Lawn. The United States presented evidence in the form of affidavits, an internal DEA memorandum, and testimony to support its position that Lawn had given Medina this deputation authority. The memorandum,[13] which was dated October 3, 1989, provided:
 
 
 34
 [a]dditionally, emergency verbal approvals for deputization can now be granted by the Chief, DEA Task Force Section, thereby bypassing, for timesaving reasons, the heretofore additional step of approval from the Administrative Director of ODCETF at the Department of Justice.
 
 
 35
 J.A. 307. The district court found "beyond any doubt whatsoever" that the delegation from Lawn to Medina, who was the Chief, DEA Task Force Section, had taken place. J.A. 376. The appellants continue to assert though that this memorandum was insufficient to constitute delegation because it had not appeared in the Federal Register and came from a subordinate of the Administrator (Westrate), not the Administrator himself. Congress, through the Administrative Procedure Act generally requires that an agency publish certain information in the Federal Register, including a description of its organization, its methods, its rules of procedure, and its substantive rules. See 5 U.S.C. Sec. 552(a)(1). Courts have interpreted this section to require publication of "matters which if not published would adversely affect a member of the public." Hogg v. United States, 428 F.2d 274, 280 (6th Cir.1970), cert. denied, 401 U.S. 910 (1971) (citing legislative history); see also United States v. Fitch Oil Co., 676 F.2d 673 (Temp. Emer. Ct.App.1982); United States v. Goodman, 605 F.2d 870, 887-88 (5th Cir.1979). In both Hogg and Fitch Oil, the courts addressed whether the failure to publish internal delegations of authority adversely affected a member of the public; in both instances they held that it did not. We are in agreement with these precedents and therefore hold that DEA's failure to timely publish this delegation in the Federal Register did not have an adverse impact upon the appellants.
 
 
 36
 Likewise, we find without merit the appellants' suggestion that the delegation was improper because it came from a memorandum written by Westrate instead of the Administrator himself since the memorandum was obviously announcing a policy that the DEA Administrator knew of and had approved. Therefore, we find no error in the district court's determination that the DEA Administrator had delegated his authority to deputize local police officers to Medina.
 
 2. Procedural Issues
 
 37
 The appellants contend that even if proper delegation to Medina occurred the DEA's failure to follow proper procedure in effectuating the deputations is cause to suppress the intercepted communications. The alleged procedural errors include (1) that no emergency existed, (2) that Medina had not been supplied the names of the local officers when he gave approval, (3) that no confirmatory paperwork was sent to DEA headquarters, (4) that no record of the approval was logged at DEA headquarters, (5) that certain follow-up forms were not submitted as required by the October 3 memorandum, (6) that no certification regarding the good standing of the BCPD officers was made, and (7) that the BCPD officers did not sign a DEA nondisclosure agreement.
 
 
 38
 The district court found and we agree that the DEA failed to comply with all the procedures for deputizing the BCPD officers. The evidence is clear that, contrary to DEA practice, the BCPD names were not given to Medina when he authorized their deputations; that no confirmatory paperwork was ever received by DEA headquarters; that the approval for deputization was never received at DEA headquarters as the October 3 memorandum required; that no written S/L 4 & 5's were immediately submitted as required by the October 3 memorandum; that no certificate of good standing was filed for the BCPD officers at the time of the emergency deputization; and that no nondisclosure agreement was presented to the BCPD officers in December 1989. Thus, we find no error in the district court's conclusion that the DEA did not "dot all its i's or cross all its t's."
 
 
 39
 We furthermore agree with the district court, though, that the failure of the DEA to follow each of its internal regulations does not provide this court with grounds to suppress the tapes of the otherwise substantively valid wiretaps. The Supreme Court has clearly held that a court need not exclude evidence obtained in violation of an agency's regulations or rules where neither the Constitution nor statute require adoption of any particular procedures. United States v. Caceres, 440 U.S. 741 (1979). While Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.Sec. 2510 et seq., regulates nonconsensual electronic surveillance, the appellants have offered no portion of that law which requires DEA to establish these procedural safeguards. Furthermore, we are of a similar view as the district court that even if these violations were grounds for relief that the appellants were not prejudiced by them in the least. Appellants have failed to demonstrate any prejudice to them arising out of the procedural irregularities. Similarly, they have failed to demonstrate that the integrity of the wiretap results was affected in any way by the sloppy deputations. This comports with the Supreme Court's view that suppression is required only for a failure to satisfy those Title III requirements that "directly and substantially implement the congressional intention to limit the use of intercept procedures to those situation clearly calling for the employment of this extraordinary device." United States v. Donovan, 429 U.S. 413, 433-34 (1977). The DEA shortcomings in regard to the deputations, while inexcusable, are not direct or substantial Title III requirements as would require suppression. We therefore reject the appellants' argument that the intercepts should have been suppressed because of the faulty deputations.
 
 3. DEA Supervision of the BCPD Officers
 
 40
 The appellants' third argument in favor of suppressing the intercepts is that the DEA failed to properly supervise the monitoring of the wiretaps by the BCPD officers because a DEA agent was not present during approximately 25% of the intercepts. Again, the appellants assert that this violated internal DEA requirements.
 
 
 41
 The trial judge found that after the wiretaps began, supervision was adequate. This finding was based on evidence that Special Agent David Rivello, the supervising DEA agent for the wiretap, was on duty 117 of the 120 days that the wiretap was operational; that he was on duty each day on which defendants claimed the BCPD officers were not supervised; that Agent Rivello typically worked from 7 a.m. to 7 p.m.; that his desk was located in the monitoring room; that he and other DEA agents were always accessible by phone, pager, or radio; and that at least six other DEA agents were working within 25 yards of the monitoring room. We agree with the district court that it is not "necessary for a DEA person to be physically there while the ministerial act kind of work is being done, so long as he is available, and in touch, and can make the discretionary kind of decisions that he is called on to make." J.A. 367-68. We therefore deny the appellants' challenge to the wiretaps on this grounds.
 
 IV.
 
 42
 The third issue raised by all four appellants stems from the trial court's decision to allow the transcripts of the electronic surveillance recordings to be used by the jury in deliberations. During this three-month long trial, the United States presented approximately 400 taped conversations as part of its case. The transcripts of these tapes were organized by the government, not in chronological order, but around the occurrence of specific events and meetings.[14] Originally the trial court determined that the tapes, which were admitted into evidence, and the transcripts were not to be taken to the jury room. After two days of deliberations, the jury sent a note to the judge which read as follows:
 
 
 43
 Judge Kaufman it is imperative that the jury have the opportunity to listen to the tapes/or transcripts in the jury room throughout deliberation. Another option, should the above be denied, please allow the jury to review the index of the transcript books. Throughout our discussions the same problem keeps arising and we need to hear "evidence" on the tapes or else we run into a dead-end.
 
 
 44
 J.A. 562. The government proposed that if the tapes were to be sent into the jury room that the transcripts should be sent as "legitimate aids to understanding," but not as evidence themselves. J.A. 563. The defendants alternatively suggested that if the books were to be allowed to go to the jury that they be reorganized by strict chronological order. Over defense objections, the trial court chose a third route; it sent the transcripts and books into the jury room as prepared by the government, but removed the index to each of the titled sections.[15]
 
 
 45
 We generally review a trial court's decision regarding the trial usage of transcripts of recorded evidence for an abuse of discretion. United States v. Collazo, 732 F.2d 1200, 1203-04 (4th Cir.1984), cert. denied, 469 U.S. 1105 (1985). The decision on whether transcripts should be taken into the jury room along with the actual taped evidence is likewise within the sound discretion of the trial court. See, e.g., United States v. Taghipour, 964 F.2d 908, 910 (9th Cir.) (per curiam), cert. denied, 113 S.Ct. 283 (1992) (abuse of discretion analysis for permitting copies of transcripts into jury room during deliberations); United States v. Ulerio, 859 F.2d 1144, 1145 (2d Cir.1988) (same); United States v. Rengifo, 789 F.2d 975, 983 (1st Cir.1986) (same).
 
 
 46
 Applying the abuse of discretion standard, courts generally have held that so long as there is "no issue as to accuracy ... it is not an abuse of discretion for a trial judge to allow the transcripts into the jury room." Taghipour, 964 F.2d at 910; see also Ulerio, 859 F.2d at 1145; Rengifo, 789 F.2d at 1362-63; United States v. Williford, 764 F.2d 1493, 1503 (11th Cir.1985). Whether it is an abuse of the trial court's discretion to allow the transcripts to go into the jury room as organized by the government has not been specifically addressed. Given the trial judge's careful examination of the options here, including the time-consuming choices of reorganizing the books or allowing the defendants to make indexes of their own, his concern that the tapes would be difficult to use without transcripts, his removal of the government indexes to the titled sections, and his admonition to the jury that only the tapes and not the transcripts were evidence, it appears that he acted well within his discretion in resolving the situation. Absent any showing of prejudice to the appellants more specific than that presented, we hold that the trial court did not abuse its discretion in allowing these transcripts into the jury room.
 
 V.
 
 47
 Having reviewed each of the appellants' remaining assignments of error and finding them to be without merit, we affirm the district court's rulings on all those further assignments. The convictions and sentences of the appellants are
 
 
 48
 AFFIRMED.
 
 
 
 [1]
 All four appellants were named in the conspiracy charge. James Williamston was additionally tried for one count of possession with intent to distribute heroin and cocaine. Namond Williams was additionally tried for three counts of possession with intent to distribute heroin and cocaine and one count of money laundering
 
 
 [2]
 The grand jury returned the original indictment in this case on April 4, 1990; it contained only the conspiracy count against nineteen (19) defendants. On April 25, 1990 it returned a Superseding Indictment, which added four (4) defendants to the conspiracy charge
 
 
 [3]
 The court required that (1) a code number be used for each juror, (2) no specific residence or business address be mentioned, and (3) the jurors be physically present at voir dire
 
 
 [4]
 During the trial, the trial court granted several motions for acquittal and dismissal and ordered that the indictment be renumbered 1 through 18. Defendants also renewed their motions to sever. In response to the government's case, several of the defendants presented defenses
 
 
 [5]
 The court ordered that the 20-year terms for Counts 5 & 11 run consecutively to one another (making the total term for those two counts forty (40) years) and that the sentences for Count 5, 11, and 13 run concurrently to the 50-year term for Count 1
 
 
 [6]
 Of the sixteen (16) black individuals on the venire panel, three (3) were excused for cause, four (4) were selected as jurors, one (1) was chosen as an alternate, seven (7) were struck by the government, and one (1) was dismissed for reasons not shown in the record
 
 
 [7]
 In striking alternates, the United States asserted that it struck one black female because she lived in Baltimore City. It also struck one black female because she was unemployed, the same reason for which it struck one white member from the jury
 
 
 [8]
 The court based this finding upon information gleaned during bail review hearings and pretrial hearings on the need for an anonymous jury. Evidence presented in these hearings demonstrated that certain defendants had employed violent tactics in their drug operations and had tracked and intimidated jurors in previous state court prosecutions
 
 
 [9]
 To establish a prima facie case, the defendant must illustrate that (1) he or she is a member of a cognizable racial group, (2) the group's members have been excluded from the defendant's jury, and (3) the circumstances of the case raise the inference that the exclusion was based on race. Batson, 476 U.S. at 96
 
 
 [10]
 The strikes of the black social worker and the unemployed black individual are unchallenged. Only those strikes based upon the potential jurors' relationship to Baltimore City are at issue
 
 
 [11]
 The existence of several decisions refusing to find that prosecutors have rebutted a prima facie case of discrimination does not cause us to reject such a rationale. See, e.g., United States v. Bishop, 959 F.2d 820, 825-26 (9th Cir.1992) (not a sufficient locale reason if juror lived in low income black neighborhood and more likely to believe that police pick on black people); United States v. Wilson, 884 F.2d 1121, 1122-24 (8th Cir.1989) (en banc ) (not sufficient reason where prosecutor struck black venireman who lived in area where the defendant worked as a civil rights worker, but did not strike white venireman who lived in same area)
 These cases do not outright reject the locale rationale, they simply find that a neutral reason was not presented to rebut the prima facie case of discrimination.
 
 
 [12]
 In its order, the district court authorized those BCPD officers who were deputized by the DEA pursuant to an application authorized by the Department of Justice to assist the DEA in intercepting communications in this matter
 
 
 [13]
 The memorandum was written by David L. Westrate, Assistant Administrator for Operations
 
 
 [14]
 The transcripts were contained in six numbered books, 1, 2, 3, 5, 6 and 7. Among these, books 6 & 7 contained all but about twenty (20) of the transcripts. Within each book the transcripts and notations of beeper activity were organized by sections. For example, in book 6 the transcripts of the tapes were grouped into sections including those entitled "RUDY AND RAMOS MEET AT THE RAMADA," "DECEMBER INTERACTION BETWEEN RUDY, JOHN & JACKIE," and"JANUARY INTERACTION BETWEEN RUDY AND 'MIKE'." J.A. 329-42. The transcripts and beeper activity notations were chronological within each indexed section, but there was no chronological reference to events in other indexed sections. Apparently the United States' organization of the transcripts in this manner helped it to more logically track the use of the tapes
 
 
 [15]
 The United States asserts that the trial court instructed the jury that only the tapes themselves were evidence and that a transcript should only be read as that particular tape was simultaneously played. The pages of the trial transcript cited to by the United States are not a part of the appeal record, but the appellants have not contested this point. Therefore, we accept as true that the court gave such an instruction. While this particular point is not one of contention, it supports the United States position that the trial judge did not abuse his discretion in allowing the transcripts to be taken into the jury room